## MINTURN v. UNITED STATES.

1. An importer of sugars having entered them at the custom-house by a warehouse entry, under sect. 12 of the act of Aug. 30, 1842, c. 270, as amended by sect. 1 of the act of Aug. 6, 1846, c. 84, gave, with sureties, a bond, conditioned to be void if he or his "assigns" should, within a specified time, withdraw them from the warehouse in the mode prescribed by law, and pay to the collector a sum specified, "or the true amount, when ascertained, of the duties imposed." The act required the sugars to be kept subject to the order of the importer, "upon payment of the proper duties," to be ascertained on entry, "and to be secured by his bond," with surety. He afterwards sold the sugars in bond, and gave to the purchaser, who agreed to pay the duties as part of the purchase price, a written authority, on which the sugars were withdrawn; but the full amount of the proper duties, which was less than the sum specified in the condition of the bond, was not paid. In a suit on the bond, to recover the unpaid duties, — *Held*; that the obligors are liable.

2. Although it is the usage of trade to sell goods in bond, and deliver them by an order for their withdrawal, the purchaser withdrawing them and paying the duties, the obligors do not become merely sureties, with the goods as the primary security for the duties, nor are they released because the officers of the United States unlawfully part with the goods without exacting payment of the duties chargeable thereon.

3. The negligence of the officers does not affect the liability of either the principal or the surety in a bond to the United States.

ERROR to the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

*Mr. William M. Evarts* and *Mr. Joseph H. Choate* for the plaintiff in error.

*Mr. Assistant Attorney-General Maury* for the United States.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

On Aug. 2, 1865, the firm of Grinnell, Minturn, & Co., being the owners of five hundred and eighty packages of sugar, imported from abroad, entered them at the custom-house in New York by a warehouse entry, and thereupon the members of that firm, as principals, and one Clark, as surety, executed under their hands and seals and delivered to the collector a warehouse bond, conditioned that the bond should be void if the principals, " or either of them, their or either of their heirs, executors, administrators, or assigns," should, " on or before the expiration of one year from the date of the importation " of the said goods, withdraw them, " in the mode prescribed by law, from the public store or bonded warehouse " where they might be deposited at the port of New York, and pay to the collector for that port $23,787.99, " or the true amount, when ascertained, of the duties imposed," by laws then existing, or thereafter to be enacted, upon the said goods, &c. On the giving of the bond, the sugars were placed in the public store and in the custody of the collector, as provided by the warehousing statutes. On Aug. 8, 1865, the owners sold to Gibson, Early, & Co. all the sugars, the same being still in warehouse, and held by the collector for duties, under said statutes. By the terms of the sale, the goods were sold expressly subject to the payment of all duties thereon by Gibson, Early, & Co., who assumed the payment of the duties as part of the agreed price of the goods on the sale, the price, less the duties so assumed, being paid in cash on delivery. The sellers made delivery of the goods in bond, subject to the duties, by writing and signing, on Aug. 9, 1865, at the foot of the warehouse entry, the following consent : " We hereby authorize Gibson, Early, & Co. to with-

draw the sugars described in this entry.   Grinnell, Minturn, & Co." It was not the custom to give any formal notice to the collector or any other officer of the customs of such sales in bond, nor was any such notice given in this case.   The authority to withdraw, in the form above stated, would be and was presented to the collector in due course before the withdrawal could be made by the purchaser.   The total weight of the sugars, as returned by the government weighers, was 755,621 pounds, upon which the proper duty, at three cents per pound, was liquidated at $22,668.63.   On Aug. 11, 1865, Gibson, Early, & Co. withdrew for transportation to Cincinnati, under the said authority from Grinnell, Minturn, & Co., 325,011 pounds of the sugar, and paid $9,750.33 duties thereon.   On Aug. 29, 1865, they withdrew for consumption, in like manner, 48,618 pounds, and paid $2,058.42 duties thereon.   Afterwards, and before Sept. 4, 1865, they sold to one Camp the residue of the sugars, the same being then in warehouse, and being, by the terms of the sale, sold in bond, expressly subject to the payment of all duties thereon by Camp, who assumed the payment of said duties as part of the agreed price of the goods on the sale.   A firm of custom-house brokers, Wylie & Wade, was employed by Camp to withdraw the sugars and to pay the duties thereon, and for that purpose was furnished by Camp with the amount of the duties, $10,859.88, in gold.   On Sept. 4, 1865, Gibson, Early, & Co. made delivery to Camp of the residue of the sugars in bond, by writing and signing at the foot of the withdrawal entry made thereof by his said brokers the following consent: " We authorize Wylie & Wade to withdraw the goods described in this entry.   Gibson, Early, & Co."   No formal notice of this sale to Camp was given to the collector or any other officer of the customs.   This last authority to withdraw was presented in due course by said brokers when they desired to withdraw the goods.   This was done on Sept. 4, 1865, when they made a withdrawal entry of the residue of the sugars, the weight of which was 361,996 pounds.   The duty at three cents per pound was $10,859.88.   But the collector demanded as duties only $9,352.89, being at the rate of three cents per pound on 311,763 pounds, leaving due, as duties, $1,506.99.   The goods were delivered to the brokers,

and were of greater value than the duties chargeable on them. This was done without the knowledge or consent of Grinnell, Minturn, & Co. The first knowledge or notice they had of the withdrawal without the payment of full duties was a notice from the collector, Dec. 6, 1867, as to the amount so remaining unpaid. Before that time the brokers had become insolvent, and Gibson, Early, & Co. became insolvent before the trial of this suit. The United States having brought suit on the bond against the obligors in it, to recover the $1,506.99, with interest, a jury was duly waived, and the court, having found the foregoing facts, found the following conclusions of law : 1, That the facts constituted no bar to a recovery ; 2, that, if the defendants were to be regarded as sureties, after the transfer of the title to the property in bond, instead of principals, they stood in no better position ; 3, that the laches of the customhouse officers, in delivering the goods without collecting the whole of the duties, could not affect the plaintiffs, as the United States were never bound by the laches of their agents, nor could the defendants set up such laches as a discharge of their obligation ; 4, that the plaintiffs were entitled to judgment. The defendants excepted to each of said conclusions of law, a judgment was rendered for the plaintiffs for $3,096.11, and the defendants brought this writ of error.

The court below also found, as facts, "that it was the established and uniform usage of trade in New York, at the times of said sales and deliveries, and long before, for importers to make sales of imported goods which were in warehouse, in bond, the purchaser on such sales assuming the payment of the duties thereon, and being allowed and credited by the seller with the amount of the duties so assumed, as so much paid on account of or deducted from what would otherwise have been the purchase price, and for the seller to make delivery of said goods in bond, by signing a written consent to the withdrawal of said goods by the purchaser, and it was also in accordance with such usage and custom for successive sales and deliveries of goods in bond to be made, on similar terms and in the same manner, so long as any of such goods remained in warehouse, the last purchaser withdrawing the goods under the written consent so received by him upon and as the delivery thereof, and paying

the duties thereon on such withdrawal; that the said custom and usage were, at the times aforesaid, well known and understood, and the established and settled practice at the custom-house in New York was to treat the party holding such consent for withdrawal, and him only, as the person entitled to withdraw and receive the goods on payment of the duties, and upon the payment by him of the duties remaining due thereon, and not otherwise, to issue a written permit for the actual delivery to him of said goods out of warehouse; and that, during the period covered by the transactions hereinbefore set forth, the following regulations of the Treasury Department were in force, to wit: 'Art. 442. The entry for withdrawal of merchandise from warehouse for consumption, at port of original importation, shall be made by the party in whose name the merchandise was warehoused, or by some person duly authorized for the purpose by him, and in either case shall be signed by the party making the withdrawal. This entry shall exhibit the marks and numbers of the packages, the description and quality of the goods, and the dutiable value of the same. On presentation to the proper officer in the collector's office, it shall be compared with the record, on the warehouse books, of the original warehouse entry, and, if found correct, be properly entered therein, the warehouse-bond number indorsed thereon, and the amount of duties payable estimated. From the collector's office it shall then be taken by the importer to the naval office, where a similar comparison shall be made with the warehouse records of that office, and the estimate of duties verified and indorsed upon the duplicate entry. The amount of duties thus ascertained having been paid, a permit will be issued for the delivery of the goods. Art. 443. Merchandise in bulk, liquors, sugars, molasses, cocoa, pepper, and other articles bought and sold by weight, when withdrawn for export or transportation, must be entered for such destination at the actual quantities on which duties were estimated at the time of arrival in the United States; and, to secure this, weighers, measurers, and gaugers will be required to mark on each package its contents, as determined by them on its entry for warehouse. On these quantities the duties on export and transportation entries will be estimated. Goods withdrawn for

consumption may be taken at average valuations, care being had that on the last withdrawal the entire balance of duty be collected. Art. 444. Should the final withdrawal entry be for export or transportation, and there be any difference between the actual duty and the amount to close the sum due on the warehouse entry, the excess, if any, shall be refunded on the last withdrawal for consumption, and the deficiency, if any, collected on amendment to said entry.' "

The contention for the plaintiffs in error is, that, by the substitution for a credit system, in the payment of duties, of a deposit of the goods in warehouse, subject to a withdrawal for consumption only on the payment of duties, involving the holding by the United States of possession of the goods in the mean time, such possession became the primary security for the duties, and the obligors in the bond were thereafter merely sureties, and were wholly released because the officers of the United States parted with the possession of the goods without exacting payment of the duties.

Section 1 of the act of Aug. 6, 1846, c. 84, amendatory of sect. 12 of the act of Aug. 30, 1842, c. 270, provides that, on an entry of goods for warehousing, the goods shall be taken possession of by the collector, and deposited in the public stores, there to be kept subject at all times to the order of the owner, importer, consignee, or agent, " upon payment of the proper duties and expenses, to be ascertained on due entry thereof for warehousing, and to be secured by a bond of the owner, importer, or consignee, with surety or sureties to the satisfaction of the collector, in double the amount of said duties, and in such form as the Secretary of the Treasury shall prescribe." It is contended by the plaintiffs in error that a private creditor, standing in the same relation to them and to the goods which the United States occupied under the warehousing system as provided for by the statute and as practically administered, could not have voluntarily surrendered the goods which had been placed in his hands as security for the payment of the debt, and which were available for that purpose, without requiring payment of the debt, otherwise than with the consent of the plaintiffs in error, without discharging them from their liability ; that the United States are entitled to no other or

higher right than a private creditor would be entitled to in the same case; and that the consent of the importers to the withdrawal of the goods by Gibson, Early, & Co. was not a consent unconditionally to their delivery, or to their delivery without the payment of duties, but only to their withdrawal from warehouse in the manner and upon the terms and conditions prescribed by law and by the treasury regulations and by usage, namely, after all duties thereon had been first paid, and not otherwise.

The warehousing statute, above cited, provides that warehoused goods shall be subject to the order of their owner on payment of the duties. Therefore, no order of the plaintiffs in error could become operative to affect any rights of the United States, unless the duties on the goods to be affected by the order were paid. Moreover, the provision as to the deposit of the goods, and their retention till the duties on them are paid, is coupled with the provision for the securing of the duties by the bond. Evidently, the intention of the statute was to superadd to the security of the holding of the goods the security of the bond, so that, in case of a delivery of the goods by fraud, or mistake, or negligence in the officers of the government, the security of the bond should remain. The form of the bond taken was such, that while, in connection with the regulations and the usage, commerce was favored by the privilege of dealing in warehoused goods, it was clearly intended to hold the obligors responsible if any purchaser from the importers should obtain the goods on their order without paying full duties. The condition is, that the bond shall be void if they or their "assigns" shall withdraw the goods and pay the "true amount" of duties. The bond is not to become void on any other condition, and it is not to become void unless, in addition to the withdrawal of the goods, the true amount of duties is paid. This view shows that the parties have contracted to be and remain principal debtors to the United States until the true amount of duties is paid, whatever fraud or negligence there may be in parting with the possession of the goods without the payment of the true amount of duties. There was no power in any officer of the government to alter the terms or effect of this contract, and destroy the obligation of the bond.

by giving up the goods without the payment of the duties. The same statute required the holding of the goods and the taking of the bond. The cases in which it has been held that the United States had parted with rights, by reason of acts done to the prejudice of persons who had contracted with them, have all been cases where there was authority of law to do such acts. In *United States* v. *Admrs. of Hillegas*, 3 Wash. C. C. 70, it was held, by Mr. Justice Washington, that acts of officers of the United States acting within their proper spheres, and to be imputed to the United States and considered as the acts of the United States, in extending the time for the payment of the debt due from a principal in a bond, discharged the sureties in the same bond, they not having known of or consented to the extension. The same principle was applied by Mr. Justice Thompson, in *United States* v. *Tillotson*, 1 Paine, 305, to the case of the alteration of a contract by the United States without the consent of the sureties for its performance. But, in the present case, the giving up of the goods without the payment of the duties was an act not only not unauthorized, but forbidden by the statute.

The question presented by this case is not a new one in this court. In *Hart* v. *United States*, 95 U. S. 316, in a suit brought by the United States against the principal and sureties, on a distiller's bond, to recover taxes on spirits distilled by the principal, the sureties pleaded that the taxes were a lien on the spirits, and that the collector, without the knowledge or assent of the sureties, and without first requiring the payment of the taxes thereon, permitted the principal to remove from the distillery warehouse distilled spirits more than sufficient in value to pay the demand. This court held, that as, under the statute, no distilled spirits could be removed from the warehouse before payment of the tax, and no officer of the United States had authority to dispense with the requirement of the law, the United States were not bound by the acts of the collector; and the prior cases of *United States* v. *Kirkpatrick*, 9 Wheat. 720 ; *United States* v. *Vanzandt*, 11 id. 184 ; *United States* v. *Nicholl*, 12 id. 505 ; *Gibbons* v. *United States*, 8 Wall. 269 ; and *Jones* v. *United States*, 18 id. 662, were cited as establishing that the government is not responsible for

the laches or the wrongful acts of its officers; and it was said by the Chief Justice, delivering the opinion of the court: "Here the surety was aware of the lien which the law gave as security for the payment of the tax. He also knew that, in order to retain this lien, the government must rely upon the diligence and honesty of its agents. If they performed their duties and preserved the security, it inured to his benefit as well as that of the government; but if, by neglect or misconduct, they lost it, the government did not come under obligations to make good the loss to him, or, what is the same thing, release him *pro tanto* from the obligation of his bond. As between himself and the government, he took the risk of the effect of official negligence upon the security which the law provided for his protection against loss, by reason of the liability he assumed." These views are conclusive to show that the importers as well as their surety are liable on the bond in this case. If the importers could be regarded as having always been, or as having at any time become, sureties only in respect of the duties, with the goods as the primary security (a position shown to be wholly untenable), it is well settled, by the decisions of this court, that the negligence of the officers of the government does not affect the liability of a surety in a bond any more than it does that of his principal. *Dox* v. *Postmaster-General*, 1 Pet. 318; *United States* v. *Kirkpatrick*, 9 Wheat. 720; *United States* v. *Vanzandt*, 11 id. 184.

*Judgment affirmed.*